The Supreme Court reversed the decree of the Court below, and reinstated the plaintiff’s bill, on May 15, 1866, and made the following order, per
Agnew, J.:
It .is therefore ordered, that the decree of the Court below be reversed, and that the defendant do account for all the stock held by him in trust for the plaintiff, and that the record be remitted to that Court, with direction to refer the case to a Master to ascertain the number of shares of the capital stock of the Bald Eagle Yalley R. R, Co., held in the hands of the defendant at the time of the filing of this bill in the Court below, at the time of his purchase of the one-eighth of the Tyrone and Lock Haven Railroad from Philip M. Price; and to take an account of the profit of the remaining two-thirds of said stock, transferred by the defendant to W. W. Willard and Peter Herdic, which would have accrued to the plaintiff, had the same been duly transferred to him before the filing of the bill, on a fair allowance to the defendant of the advances made by him or on his behalf in payment of the said shares of stock; and make a report of the *493 same, together with the form or draft of a final decree necessary and proper to be made by the said Court in this behalf; and that the said Court do thereupon proceed to make such order and decree, as in equity and justice it believes ought to be made, and according to the principles set forth in this opinion.
Robt. Hawley, Esq., was appointed Master and made a report and tbe Court made a decree ordering John W. Maynard to transfer the 390 shares remaining in his name, and that he pay $35,768.24, the profits which would have accrued to Brady on the stock transferred to Herdic and Willard.
Maynard then appealed and Hon. Jeremiah S. Black and C. A. Mayer, Esq., argued in his behalf, that the decree previously made was not to be regarded as settling the questions, involved; Pennock’s Estate, 8 Harris, 268. According to Brady’s own statement he was trying to defraud and hinder his creditors; and was therefore not entitled to equitable relief. At most Brady would only have an election to take the money or stock; and he took the money. When the property was struck down, the amount that Brady was entitled to get was fixed ; and if Maynard subsequently purchased an interest in the road, Brady was not injured.
W. H. Armstrong, James Armstrong and G. W. Youngman, Esqs., for appellee argued that the Supreme Court decided the question on the former appeal; Brightly’s Eq., 530. The bill stated the fraud sufficiently; Story’s Eq., Pl., Sect. 27; Story’s Eq., Sect. 253, 186, 187, 188, 190. The cestui que trust may proceed against the trustee alone where the trustee has improperly parted with the trust property ; Story’s Eq. Plead., Section 221. Maynard, having acted fraudulently, was not entitled to compensation; Swartswalters Account, 4 Watts, 77; Bredin vs. Kingland, 4 Watts, 420; Fisher vs. Knox, 1 Harris, 622. Maynard having refused to account is liable for the highest market price; Reitenbaugh vs. Ludwig, 7 Casey, 131; Bank vs. Reese, 2 Casey, 143; Mayne vs. Damages, 96; Suydam vs. Jenkins, 3 Sanford S. C., 614; Sedgwick Damages, 266; West vs. Beach, 3 Cowen, 82; McAuthor vs. Seaforth, 2 Taunton, 258.
The Supreme Court reversed the decision of the Court below and dismissed the bill on May 14, 1867, in the following opinion by
*494 Thompson, J.:
The principal ground claimed by the plaintiff for a decree against the defendant in this bill, is stated by his counsel as follows : “On the 24th of November, 1862, Samuel Brady, the plaintiff, filed his bill in equity against John W. Maynard, defendant claiming from him certain shares of the capital stock of the Bald Eagle Yalley Railroad Co., which he charged the defendant with having obtained as attorney for him, aud in which he (Maynard) had no interest in his own right, but only as trustee for said Brady, and which he refuses to transfer to the plaintiff.” On this point the bill charges as follows :
“XXX. And your orator further saith, that the said Maynard never at any time had any connection with the business of the said Brady, except as his attorney and counsellor at law, and the stoek, and money, and notes, and drafts, and bonds, hereinbefore referred to, came into the hands of the said Maynard in his capacity of attorney and counsellor of the said Brady, and in no other manner whatever.”
It is a trust, not by express contract, nor as resulting from the payment of money, but solely one springing from the relation of counsel and client, which it is the object of this bill to enforce. I did not hear the argument when the case was up before, being absent at Nisi Prius, but on looking at the paper book of the appellant on that occasion, the appellee now, this was asserted then as now, to be the foundation for the plaintiff’s claim for relief. Indeed, upon no other ground is there a semblance of a case for the plaintiff upon the principal or important matter charged. There are other matters of minor consequence charged in the bill, which will be noticed in the course of this opinion.
On the 26th of November, 1862, as above stated, the plaintiff’s bill was filed. On the 29th of April following, the plaintiff assigned all his claims in the case to A. H. Best; and before hearing, and on the 6th of December, 1863 Brady died, and Best succeeded him in this suit as administrator, and now prosecutes it for the benefit of himself as assignee. So the record stands.
The main inquiries will be, whether the one-eighth interest in the purchase of the “Tyrone and Lock Haven’ Railroad,” taken *495 in the name of Maynard, was as counsel for Brady, or for himself, after that relation had ceased ? Or if the relation continued, was it with the assent of Brady either at the time or afterwards that it was taken by the defendant? If it was acquired as counsel in the pursuit of his client’s demand, and he was not released from his obligation as such to hold it for his client, there is no principle in the law which will or ought to shelter him from liability to account to the latter, and to answer on account of his breach of trust. If the property was his clients in equity he must deliver it up, or pay for it, no matter to whom he may have transferred it. The relation of counsel and client is one of strict confidence and trust, and must be carried through in good faith. The law, therefore, wisely strikes down every temptation to deviate from this requirement, by refusing to counsel the right to acquire any, even the possibility of an interest, antagonistic to that of the client, growing out of the business in which the relation originated. It would, however, be an unnecessary consumption of time to enlarge on the nature of the relation. Every judge has pronounced upon it, and every lawyer knows it; and they well know, and with rare exceptions act upon the knowledge, that the law guards with jeal • bus care every interest within it.
Before proceeding to the consideration of theinquirieB'suggested, there is a preliminary question to be disposed of; and that is whether the decretal order made when the case was before us on the appeal of the plaintiff, must be regarded as a finality upon the questions now before us ; and which, it must be admitted, were, substantially, supposed to have been passed upon then ? The object of the order made, is apparent on its face. It was a direction to the Court below how to proceed in making their decree on the merits of the bill which they had dismissed, and which was reinstated by the order. It is not intended to be denied, however, that this is in substance a re-argument of the questions passed upon then, in order to arrive at the result of that appeal, viz., a reversal of the decision of the Court below dismissing the plaintiff’s bill; but no such decree was before us then as now, in form or substance. But conceding all that can be claimed; to wit, that it is a re-argument before a full bench, this, as everybody knows, is very common in practice, and is never, or at least ought never *496 to be complained of. “What harm can gold catch in the fire, or truth in discussion ?” was an apothegm oí Archbishop Cranmer, not less true in judicial than in philosophic investigations.
The order was, therefore, not a decree. It was neither so said nor so intended, nor so in form. It was a reinstatement of a dismissed bill, with an order of procedendo, and statement of*principles to govern as “equity and justice” would approve in making a final decree. Nothing could deprive the defendant against whom it was to be entered, of his right to appeal, and his right to an argument on every principle involved in it, otherwise the right to appeal would be simply a mockery. It is no answer to this, that the Court has once expressed an opinion on all the points involved, especially as it has not expressed it in the form accepted by the law as evidence of its final determination, namely; by a decree or judgment. It is true the laboring oar is in the hands of the party who undertakes to stem the current of pre-declared opinion, but he has a right to do it if he can, and the Court must listen to the suggestions of possible error in its opinions, if it have any ambition to be regarded as a “Court of justice.”
But it is suggested that the appellee is here relying on the opinion given a year ago in this case, and not to re-argue it. Doubtless he does ,• and so does every party rely on some authority or principle deemed applicable to his case, and yet it often happens that the case relied on is itself not law. If every deóision, once pronounced were to be implicitly followed because once made, error would never be corrected, and to justify this on logical grounds, Courts would have to be invested with imputed infallibility at least. The assent seems very general that Courts may err, and it is not less universal that they are bound to correct their errors as speedily as possible when they discover them. We must, therefore, carefully look into our former opinion, in the presence of the strong appeal made against its accuracy in view of the facts, and see if it be right or wrong.
On the suggestion of surprise or want of notice of an intended discussion of the principles involved, when the case was here before, we can but regard it, after the very able argument presented by the counsel of the appellee, on every point iu the case, rather as an illustration of what might happen without notice, than *497 what did happen in this case. There seems to have been no want of preparation indicated by the paper book or in the oral argument. The learned counsel knew that the case was up on appeal, and that this proffered a .contest which they must abide ;• and they did, with great ability, aided by the opinion of my learned brother in the case, and which had the assent of the whole Court present at the argument. Should the rehearing of the principles of this case result in a different judgment from that expressed, but'not pronounced in a definite form, it will neither be derogatory to the Court nor we hope, prejudicial to justice. That this has occurred in numberless cases, in all Courts, all lawyers know. The case of Pennock’s Estate, 8 Har. 268, is strikingly illustrative of what this Court has thought its duty to be in order to reach justice between individuals. Not only was there one, but two judgments, set aside by a third, and decided opinions in support of each were given. We reverse no judgment or decree in this case if we depart from the former opinion expressed. If we disturb anything it is not in the nature of a right, fixed and settled, but a mere expectancy. Regarding, therefore, what was done in the former argument or hearing, as a mere order, and not a decree, we will proceed to consider the merits of this appeal.
Brady, the plaintiff, had been a contractor on the Tyrone and Lock Haven railroad, and on settlement with the company for work done, made in 1859, he took their bonds at fifty cents on the dollar in payment, the company being without money or other means of payment. This claim being liquidated at $52,000, he received from them $104,000 of their bonds. The company being insolvent, he consulted counsel about collecting this claim against it. The defendant advised that a sale of the road and its franchises be made. To accomplish this, the defendant and Mr. Campbell, of this city, were retained as counsel, and so proceeded as to have a sale ordered by this Court, to take place in this city in Novembe r, 1860. The sale took place, and the property was struck down to Brady, the complainant, for the sum of $51,000, but the amount bid exceeding by $20,000 the sum he was authorzied to bid by parties associated with him to buy, they refused to consummate the purchase, and he not being able himself to do so, the sale failed. His counsel, at his request, proceeded again for a new order of sale, *498 which was obtained, to take place on the 29th January, 1861 At that sale the property was struck down to Mr. Price, for the sum of $21,000. The bid was paid according to the terms oí sale, and the property passed eventually to a new company, called the “Bald Eagle Valley Railroad Company,” incorporated by the Act of 26th of March, 1861. Before Mr. Price bought there was an informal understanding between him and a number of others, that he was to purchase for the benefit of all, and that the property was to be paid for and held in shares, eight in number, by these several parties. There was no specific contract shown in regard to this, but a mere understanding. When the road was purchased and passed to the new company, these shares were divided into stock of one thousand shares each, the par of which was $50 per share. Out of the purchase by Mr. Price, at the second sale, and out of the share set down-to, or in the name of, the defendant, in tliis bill, the difficulty before us has arisen.
■ That the defendant was counsel for Brady up to the time of the sale, and until the money realized from it was collected and- paid over to him, or to his order, is not disputed. He attended the sale, and seems to have made every reasonable effort to. promote the in'erests of his client. He obtained favorable terms for him from the intended purchaser of the road, in an agreement that if the property brought less than $25,000, the amount agreed to be bid for it, he, Brady, should have two-thirds of any sum less than that, which it might bring, in addition to his pro rata on the bonds'held by him. This was a good arrangement for him, out of which he actually realized a sum more than equal to his distributive share upon the bonds. And here it may be as well as in any connection to state that before filing the bill in this case against the defendant, the testimony clearly shows that Brady had received through him as his counsel, every dollar coming to him from the proceeds of the sale , and also, that he had taken out of his hands Price’s draft for his share of the four thousand dollars, the sum less than $25,000 bid for the road, being $2,666,-66. When the decree was asked for below, it is true, if any fact can be proved by testimony, oral of written, that the defendant held no money of the- plaintiff as his counsel, nof had applied any of his money or property to the 'purchase of any share in the Ty *499 rone and Lock Haven road, nor to the purchase of any stock whatever. And it equally clearly appears, that he had applied the money collected for Brady, only as the latter had ordered or directed. Whatever equity, therefore, the plaintiff claims arises solely out of the relation of counsel and client, and not by reason of the application of his money or moneys. This is the ground taken by his counsel, as already stated.
The charges in the plaintiff’s bill against the defendant, in which as essential elements of his case are trust and fraud, are distinctly and positively denied by the answer. Are they, therefore, so fully sustained by the proofs as to demand an affirmance of the decree made below ? Relatively they- should be clearly established. A doubtful equity is like a doubtful charter, it will not come up to what it aims at. The proof should clearly preponderate in the affirmative' over its opposite. Is that this case? When it .was first tried below, the learned judge decided against it, and delivered a very able opinion in vindication of his conclusions. We reversed his decree, and in the present case he has but followed what he understood to be his duty in making it.
Our first inquiry is, whether the proof establishes, according to equity practice, that a trust in favor of Brady arose when the share in the purchase of the Tyrone and Lock Haven Railroad was set down to the defendant, or whether that relation was extended by the parties to take in any purchase of an interest from the successful bidder at that sale ? That this necessarily resulted from the pre-existing relation of attorney to procure a sale of the property will not be pretended. It is not the business of an attorney to buy back property sold even on his client’s execution, where it has already been purchased by a third party. That is the work of an agent, not an attorney ; and that was the exact apparent position here. Are we to assume, in order to establish such a relation, that it had been agreed on that in order to collect as much as possible for his client, the property should -be sold, .and the pro rata should be collected from the purchaser-and then an interest brought back by the defendant from that purchaser ? .There is no proof of this, and the difficulty in the way of assuming it is, that it is not within the ordinary scope of the duty .of an attorney employed to collect a debt; and if .by any process *500 of reasoning it might be made to appear so, in that case the money collected should be in the hands of the attorney. We are outside of all acknowledged relations excepting those of the family, when we assume that one person is bound to buy for another, and pay for it into the bargain. That duty, if it can be inferred,must arise from some express contract, and this implies that there must be proof of such contract. But this is not claimed here. Let us look-somewhat at the testimony and see if there be ground for liability as counsel.
The principal witnesses for the plaintiff on this point are Mackey and Price. If they do not make out that relation, it does not exist. Quod non apparentibus de non existentibus. It is to be noticed that neither of these state more in regard to the arrangement for the purchase of the road, prior to the sale, than that it was understood that Maynard would take an eighth. No contract, agreement, or declaration of his to that effect is proved. Nor is it charged in the bill that any contract with anybody existed. If such an agreement did exist, is strange that it has not been produced or even alleged by the plaintifF. Is it to be inferred from what transpired at and after the sale ? Neither fraud nor a special contract are to be imputed -without proof. Especially as to the former, the proof must be clear. A contract to purchase the stock for plaintiff outside of the relation of counsel, is not alleged. Is there proof that he obtained it in this character by any fraud on his client ?
This can only be affirmed on assuming that he took the share under pretence as counsel and by virtueof his relation as such, and afterwards fraudulently denied that relation. In looking at a case of this kind in which there is an alleged fraud, inducements may be taken into account to explain the conduct of parties if facts are not clear. The proof discloses that there was not any great inducement to invest in this broken-down enterprise at the time it was Sold out. Whether money would eventually be made out of it was far from certain, and depended on many contingencies. One company had failed to raise the means to build the road. There was no certainty that another would be more fortunate. The times were discouraging to all such enterprises ; money was scarce and war imminent. A new charter was to be obtained, and *501 mea of capital, under all the discouraging circumstances, were to be interested in it. It was “a lottery,” says one or more of the witnesses, whether anything would be made out of it or not, and the proof is that for between one and two years after the new organization, the stock sold from $2.69 to $8 per share. In the light of these facts we must consider the testimony in regard to what took place by the parties at about the time of the sale, when the plaintiff’s claim, if ever, originated. Certainly the inducements to invest in the enterprise either on the part of Maynard or Brady, was not very urgent.
Mackey testifies that after the sale was over, and on the same day, Price, the purchaser, called Maynard’s attention to the payment of what he supposed would be his share of the $5,000, he, Price, had paid on the bid, proceeding on an understanding he had that the former would take a share in it. To this Maynard replied that he could not take a share without Brady’s assent; and further said, with some feeling, as the witness thought, “Mr. Brady is my client, and I will not allow him or any other client to place me in a false position, or say that any advantage has been taken of him and he referred Price to him. After some further conversation between these parties, in the presence of Brady, Maynard, as the witness recollects, said : “Mr. Price, I leave this whole matter with Mr. Brady ; if he concludes to take the share, you may draw on me for the money.” In answer to the bill the defendant says, under oath, his language was, “if he (Brady) concludes not to take it draw on me for money.” This is what is to be disproved by the plaintiff on this point. It will be perceived by this testimony that Mackey makes Maynard’s refusal to take the stock for any other than Brady, positive and final, and that Price’s only authority to draw for the money was to be in the event of Brady taking the share, and not him. It this represents the true state of the case, it presents a case of a promise to pay, and not necessarily a case coming within the duty of an attorney, and must have resulted from some agreement not proved, to apply the proceeds of the sale to the purchase of the share. That is rendered unreasonable as a conclusion, because Maynard had no money at that time belonging to Brady, and might not have any for months to come, as turned out to be the case. But after this *502 positive declination to act further on the subject if Brady intended to take it, how can the silence of the latter be accounted for ? If Maynard was willing to undertake to pay for what Brady wanted, why did not the latter take it on the spot ? He was not sure of the speculation, and did not want to risk his money, would be the only fair inference in the light of the surrounding circumstances already referred to. If not then when did he become clear in regard to it.
Price’s testimony differs from this materially. After stating that he applied to Maynard to arrange for the share he supposed he was to take in the purchase, and he repeated in substance as stated by Mackey. Price says : “I urged upon him that he was one of the parties we had counted on’ to take the property, and if he declined we should have to make other arrangements.” Maynard then referred him to Brady. That he communicated to him what Maynard said about taking a share. In reply, Brady claimed a larger share, and witness told him he could not have it ; that there was one share only between him and Maynard. After some further conversation between them, and as Maynard was about starting to the cars for home, he said to witness, according to his best recollection, Brady being present, “Brady will tell you what to do about the share. If he concludes to take it, or if we conclude to take it,” witness cannot say which, “he (Brady) will let you know, and you may draw on me for the money.” He further states that Mackey and Maynard were in a hurry and immediately started for the depot. The next morning the witness says he called on Brady, that he told him he had “concluded to take the share as he could not get any more, and that I should draw upon Maynard for the money. Nothing was said about whose name the share should be taken in, and I, of course, put it down to Judge Maynard’s name and drew upon him, and the draft was paid.” It is apparent from this that unless Mackey’s account of it be accurate, Maynard paid without knowing anything about Brady concluding to take the stock. According to Price’s testimony, he might have paid it under the well grounded belief that he was taking it for himself, and according to both, here was an open, plain declaration and notice to Brady to determine for himself as to whether he would take the stock or not. How can fraud be inferred from this ?
*503 But Mr. Price’s memory is in conflict with his contemporaneous correspondence. His testimony is taken two years and a half after the transaction. His letter to Maynard about Brady’s decision in regard to the share, is the day after, when Brady, it is said, made his decision about it. The discrepancy cannot be attributed to anything other than want of memory. I would not attribute it to falsehood : but it exists, and the letter being written in accordance with the desire and the busii ess of the parties, was evidence. The letter is dated July 30th, 1861, the day after the sale, and is addressed to the defendant; it says : “I saw Mr. Brady this morning. He says he or you will take the share and after informing the defendant he would draw on him the next day for the one-seventh of $5,000 instead of one-eighth, concludes thus, “I hope Mr. B. will not take himself.” This it must be admitted, is not reconcilable with this witness’ testimony nor his testimony with it, but exactly accords with what he was authorized to do in case Brady did not take the share ; to put it down to Maynard, draw on him for the money, and apply it in payment of the share so set down to him. This he did after writing the defendant a letter containing the declarations of Brady, and his own, showing as plainly as could be that the former had not concluded to take the stock. That Price so understood Brady, is not to be doubted, if we allow the letter to speak to the point. After stating that Brady said he or you would take the share, he adds at the end of the letter his hopes “that Brady will not take it.” “ Will” expresses a future action, and shows that Brady had not taken it in the present tense. Upon this information he drew on Maynard, and he accepted his draft and it was paid.
All this testimony of Mackey, Price and the letter, goes no further than to show at the utmost, that Maynard said he would pay for the stock if Braly took it. If he did not take it, he would take it himself. This was declared openly and directly to Brady. We may not surmise that something else was said of which we have no proof. If we did, who shall say how much beyond or below the mark we might fall, and how is it to be determined that it is neither, but that we have just hit the mark ?
The object of the testimony was to support the bill in the allegation that the defendant, in his character of counsel, obtained *504 the stock, and it was therefore the plaintiffs. The sale had taken place and a third party- had become the purchaser. Maynard was not a purchaser. Nobody' says that. Price says: “We counted on him” to take a share, but if he did not we will have to make other arrangements. Neither the plaintiff in the bill, nor any witness testifies that Price bid for Maynard. If he was a purchaser through Price, it was not proved. Nor did Mackey or Price allege it at the moment Maynard declared he would have no interest in it or be a contractor for a share. Is it unreasonable to suppose they would have alleged it if such had been the case ? But Price only says, if he did not take it as “counted upon,” we will have to make other arrangements, and to Brady', “there is one share between you and Maynard,” you had better settle the matter between you.
Not being shown to have been an original purchaser, Maymard’s legitimate concern pursuant to his engagement to collect the money for Brady^ was to look after that. It had gone into one set of hands and the property into another. Which was he to follow? The money, of course. His client had a right in that, and none in the other. He could not under the trustee’s sale, claim to be; the owner of the property and money both. Now, if with the assent and at the instance of his client, he recovered the money and paid it over to him, or, if that w'as intended to be the course to be pursued at and after the sale, and that it w’as, may be inferred from its having been pursued, as counsel it was not Maynard’s duty to purchase any interest in the property for him. He might become his agent for that purpose, but that is not alleged. He might also, as counsel, have undertaken to apply' the money he was collecting to that purpose, but that is not proved. It is disproved by all the testimony ; that shows that the money was collected by' Maynard and jaid over to Brady, or to his order, and none of it applied or retained for any such purpose. The proof does not show that the property should have brought more than it did, nor that a single bidder was deterred from ©r induced not to bid, by the efforts of the defendant. As already seen, it was not a time in which such a sale would command active competition. In November, previously, parties had agreed to go to the extent of $30,000 for the road and franchises. On the 29th of *505 January following, it was sold for $21,000. It is in the current history of the times, that there was then a darker, deeper shade over business, money, and the prospects of the country, than in November, or at any time preceding ; and this will account for the diminution in price from what it had been estimated at in November, and what it was expected to, and did bring in 3 any. without assuming that it resulted as a part of a scheme or fraud by the defendant, in order to purchase an interest in a doubtful enterprise.
In order to hold the defendant answerable under the bill, the plaintiff was bound to show that he fraudulently and without plaintiff’s knowledge, was secretly a purchaser of the property with others, after depressing its value, thus defrauding him of what he should have otherwise realized from it on his claim. This he has not done. On the contrary, if $25,000 was a fair bid for the property, as we may suppose it was in January, when $30,000 was considered the full value in November, every dollar bid less than the $25,000 was to be seventy-five per cent, gain to the plaintiff by arrangements of his counsel, agreed to and received by him. I see not how, therefore, he could allege fraud in this against the defendant. If there was, he was a participant. But it has not been shown that he was a purchaser at all when the property was struck down, nor does his claim to the share rest on that, but on what took place after the sale. That was not the result of any secret arrangement. It we may believe the plaintiff’s witnesses, whatever advantage the defendant might have been able to secure under the purchase, he openly ottered to the plaintiff. If the value of the property had been depressed by efforts of the defendant, and a share would cost less for that reason, the advantage was offered to the plaintiff. He failed to decide to take it, and so far as we can learn from the testimony, Maynard was never notified by any one that he had elected to take the share. Price does not say he informed Maynard, and certainly his letter written at a time when it is alleged he did decide, gave no information to the defendant of any election he had made. Without pursuing this line of remark further; in conclusion, on this aspect of the case, we are unable to see any ground upon which to hold the defendant answerable in the relation of counsel., or that the relation *506 existed in the purchase of the share of the Tioga and Lock Haven Railroad, or that he was the purchaser of any interest until after the sale, when the plaintiff’s money had been made out of it. Nor evidence of any fraud practiced by the defendant, so as to turn him into a trustee ex maleficio.
I have thus far treated the case without reference to the subsequent acts and declarations of the parties in regard to the matter principally in contest, and here, it seems to me, that those of the plaintiff’s intestate are irreconcilable with the present claim. As soon as was proper after the sale, he presented his bonds to the master, and claimed his distributive share of the proceeds. After the adjustment of his share, and its receipt by counsel, the defendant, he commenced drawing it out of his hands, and continued until all was drawn, without referring to any claim upon the share standing in the defendant’s name. This conduct accords with no theory excepting that of the appellee, viz., that he well knew he had no claim to anything but the money under the sale. So his acts in opposing the passage of the bill to incorporate the new company, and the declaration in his letter of the 8th April, 1861, in which he threatens, if he fails in obtaining a contract for building the road under the new company, to “open the batteries and throw shell as well as balland his subsequent declaration that he hoped the new company would lose every cent they had put into it, excepting the defendant, whom he “did not want to see lose,” and many other expressions of similar import, all corroborate and substantiate the defence. It is contrary to all experience-that theowner of property-should seek its destruction or injury, when the result would in no way benefit him ; and in a doubtful case it is always powerful evidence to raise an impression that the alleged ownership does not exist.
It is said, that on the other side, these acts and declarations are persuasive the other way, and that like algebraic equations they balance each other, and may be stricken out. I have examined them and think the conclusion not to be adopted. One witness asks defendant if Brady got money from the company, and he says, defendant replied “stock.” If the defendant did say that, the fact was otherwise. It is incontestable that he got money from the company he had sued, and did not get. any stock from *507 that company. It is, therefore, probable that the reply was misunderstood or misremembered. So of the remark, if made, that it would depend on the price of stock if he could pay his debts. This was not necessarily referable to the question of ownership of the stock. It may have referred to it, but it is equally possible it may not. So, his saying he would accept an order for a sum of money, which was small, in favor of the witness, if Brady would give it, did not imply that he held stock belonging to Brady. It did imply either that he knew Brady would not give it, or that he had money to pay it with. Brady never did draw the order. The offer of defendant to take one hundred and seventy dividend shares of stock from the new company, and credit the company on Price’s draft is relied on as evidence of an admission that the original stock belonged to Brady. The testimony shows that these drafts were still held by the defendant for plaintiff, and that he wanted to have them applied in payment of the stock at the request of Brady. The company declined the transaction, and demanded three dollars per share in cash. No one can fairly infer, we think, from any one or all of these declarations, anything inconsistent with the defendant’s position in regard to the share in question, while those of the plaintiff are wholly inconsistent with us.
While some of us, in favor of reversing the decree made in this case are entirely satisfied with these views and their sufficiency to require that result, the majority of the Court are clear that even if there was an arrangement about the share to be purchased in tha.name of. the.,counsel for the .defendant, it must have been with an understanding that the money to be collected was to go in payment of it. We cannot subscribe to the doctrine that counsel must buy and pay for property for the client as a result of the relation. We, therefore, see no equity in the plaintiff in the absence of payment, or the pledge of the means of payment. No title accrued to the intestate by reason of the application of any of his money to the purchase. This is certain. He drew it all out long before he made the present claim. If it were intended so to be applied, it was not, and the whole scheme on that basis must be regarded as having been abandoned. “Acts speak louder than words,” is a proverb, and such acts as these go far to show that not only had the plaintiff no good claim, but was willing to *508 press one that was groundless and unconscionable, without a pretext that he had paid anything for it directly, or suffer a loss on account of it.
I have treated this ease on the grounds on which it was placed by the plaintiff’s counsel, without regard to any alleged interest in Willard and Herdic. I see nothing to have required them to have been made parties, nor were they incompetent as witnesses. The bill sought no decree against them. They never made any claim to the three hundred and thirty-three shares of stock yet in the defendant’s name, and which the bill prays that defendant might be required to transfer to the plaintiff, nor were they required to account for profits.
As to the prayer for an account, by the plaintiff, for money collected by the defendant from the Tyrone and Lock Haven Railroad Company, and for the amount of Price’s drafts in his favor, we will say but little. It is clear, beyond all controversy, from Brady’s own receipts, vouchers, and ackowledgments, that all had been accounted for and paid, and nothing whatever remained in the defendant’s hands from that source, before he swore to and filed his bill. Further notice is unnecessary.
Notwithstanding the length of this opinion, there are many things which were referred to in argument to which we have given no special notice, but which have been duly considered, and do not effect the general result. A majority of us thinking that the testimony in the case did not sustain the plaintiff’s right in the decree below, it is accordingly reversed at the cost of the plaintiff, and the bill is dismissed.
Woodward, C. J. concurred with the foregoing ; but in addition said that: The pleadings and evidence demonstrate beyond all doubt, that Brady, deeply insolvent, intended either not to- have any beneficial interest in the stock in question, or else to cloak it from his creditors. His shuffling and equivocal conduct will bear no other construction. And his assignment of this very equity suit, exhibits the same purpose to place the fruits of the speculation beyond the reach of his creditors. That a Court of Chancery will, not interfere to relieve a fraudulent debtor from the conse *509 quenees of his attempt to delay and hinder creditors, is a first principle of equity jurisprudence. Who seeks equity, must come into Court with clear hands. If he has bound himself, for fraudulent purposes ; equity will leave him bound. Brady, in the best view of his case, comes into Court under this cloud, and if the other reasons for dismissing his bill be not sufficient, it ought to be dismissed, I think on this ground.
Note. — As to transactions between attorney and client, see Evans vs. Ellis, 5 Denio, 640; Brock vs. Barnes, 40 Barb. 521; Howell vs. Ransom, 11 Paige, 538; Greenfield’s Estate, 2 Harris, 489; Post vs. Mason, 91 N. Y. 539; Yeamans vs. James, 27 Kansas, 195; Stout vs. Smith, 98 N. Y. 25; Alwood vs. Mansfield, 59 Ill. 496; Kisling vs. Shaw, 33 Cal. 425; Gibbons vs. Hoag, 95 Ill. 45; Ryan vs. Ashton, 42 Ia. 365; Byers vs. Surget, 19 Howard, 303; Whipple vs. Barton, 63 N. H. 613; Shipman vs. Furniss, 69 Ala. 555; Huguenin vs. Basely, 2 W. & T. Leading Cases in Equity, 1156 and note; Dunn vs. Dunn, 7 Atlantic Reporter, 842 and note; Elliott vs. Taylor, 6 Atlantic Rep. 917.